# Syllabus

Chief Justice:
Megan K. Cavanagh

Justices:
Brian K. Zahra
Richard H. Bernstein
Elizabeth M. Welch
Kyra H. Bolden
Kimberly A. Thomas
Noah P. Hood

**This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.**

Reporter of Decisions:
Kimberly K. Muschong

PEOPLE v SERGES

Docket No. 167154. Argued on application for leave to appeal January 21, 2026. Decided July 30, 2026.

David H. Serges was convicted following a jury trial in the Genesee Circuit Court of first-degree murder, MCL 750.316, in connection with the death of an elderly woman in her home; an earlier trial on the same charge had resulted in a hung jury. The victim, who died from multiple blunt force traumas to her head, was discovered by a neighbor; a window of several days was identified between when she was last seen and when her body was found. Although no information from the crime scene was found that identified defendant as a potential suspect, several individuals mentioned that they had seen defendant in the neighborhood during the period of time when the victim might have been killed, and defendant had previously done housework and yardwork for the victim. When taken into custody and questioned, defendant denied any involvement in the victim's murder.

Defendant was arrested on November 29, 2017; later, there was a question whether he had been arrested for a 2016 unrelated misdemeanor charge, as the police report stated, or on suspicion of homicide, as a detective later testified. On November 30, defendant was arraigned on the misdemeanor charge, and the detective collected defendant's pants and other effects from the jail property room and took them into police custody. More than a month later, and without first seeking a search warrant or defendant's consent, the police department submitted defendant's pants for deoxyribonucleic acid (DNA) testing. The lab determined that a small amount of blood found on the pants was consistent with the victim's DNA.

At the second trial, the defense theory was that the minuscule amount of blood found on defendant's pants did not logically connect him to the bloody crime scene; defense counsel did not move to suppress the DNA test results. After he was convicted and sentenced, defendant moved for a new trial or an evidentiary hearing, arguing in relevant part that the DNA evidence from his pants should have been suppressed on grounds that the DNA testing constituted an unconstitutional search and seizure and that trial counsel was ineffective for failing to move to suppress this evidence. The court, Elizabeth A. Kelly, J., denied the motion.

Defendant appealed by right in the Court of Appeals and filed a motion to remand for an evidentiary hearing to develop his claim that trial counsel was ineffective, which the Court granted.

After the hearing, the trial court denied the motion for new trial, holding that trial counsel had provided effective assistance; relevant to the issues here, the court found that defendant initially had been arrested and detained on the unrelated misdemeanor charge. The Court of Appeals, N. P. HOOD, P.J., and REDFORD, J. (SWARTZLE, J., concurring *dubitante*), affirmed defendant's conviction and sentence. 351 Mich App 88 (2024). Defendant sought leave to appeal in the Supreme Court, which ordered and heard oral argument on the application. ___ Mich ___; 20 NW3d 864 (2025).

In an opinion by Justice BERNSTEIN, joined by Chief Justice CAVANAGH and Justices WELCH, BOLDEN, and THOMAS, the Supreme Court, in lieu of granting leave to appeal, *held*:

The DNA testing of defendant's effects without a warrant or defendant's consent constituted an unreasonable search under Article 1, § 11 of Michigan's 1963 Constitution. The DNA testing of defendant's pants without a warrant was not part of a reasonable inventory search, nor was it justified under the search-incident-to-arrest exception to the warrant requirement, especially when the arrest was for a charge unrelated to the reason for the search. Trial counsel was ineffective because he failed to move to suppress the fruits of this unconstitutional search; defendant was prejudiced by counsel's errors because the DNA evidence was the only physical evidence that connected defendant to the scene of the crime.

1. The DNA testing of defendant's effects constituted a search under the trespass approach, and it was an unreasonable search in violation of Const 1963, art 1, § 11, because it took place without defendant's consent or a warrant. Under the trespass approach, a search occurs when the government occupies private property for the purpose of obtaining information. In other words, courts consider whether there was a physical trespass on a constitutionally protected area and whether there was an attempt to obtain information. The DNA testing of defendant's pants was a search under both the Fourth Amendment and Article 1, § 11. Defendant's effects or possessions were no less constitutionally protected than his own person, and the DNA testing was ordered by the police to obtain information. Because the DNA testing was a search under the trespass approach, it was unnecessary to consider whether and to what degree defendant had a reasonable expectation of privacy either in his own pants that were worn in public or any blood found on those pants.

2. The warrantless search of defendant's pants was not reasonable under the inventory-search exception. It is not unreasonable for police, as part of the routine procedure incident to incarcerating an arrested person, to search any container or article in his possession, in accordance with established inventory procedures. DNA testing, however, is not part of established *inventory* procedure, and the police in this case collected defendant's effects for an *investigative* search for which they had neither consent nor a warrant. DNA testing is also not necessary for the protection of the owner's property while it remains in police custody, for the protection of the police against claims or disputes over lost or stolen property, or for the protection of the police from potential danger. Here, there was no indication in the record that DNA testing of defendant's effects was a standardized procedure when an individual is arrested and detained in jail. Further, the DNA testing of defendant's effects weeks later by the police department did not contribute to any interests in safeguarding defendant's property or protecting the police from danger.

3. The warrantless search of defendant's pants was not reasonable under the search-incident-to-arrest exception. The exception permits warrantless searches incident to custodial arrests, and has traditionally been justified by the reasonableness of searching for weapons, instruments of escape, and evidence of crime when a person is taken into official custody and lawfully detained. DNA testing of a defendant's effects does nothing to further the interests of public safety. Under *People v Carr*, 370 Mich 251 (1963), and *People v Trudeau*, 385 Mich 276 (1971), where a defendant has been arrested and incarcerated for one crime, the search-incident-to-arrest exception does not apply under Const 1963, art 1, § 11, when the defendant is then searched for evidence of another crime. Here, defendant was arrested with respect to one crime, and his effects were then searched without a warrant in connection with another crime, contrary to the holding in *Carr* and in violation of Const 1963, art 1, § 11. The Court of Appeals necessarily erred when it substituted its judgment for that of the trial court and concluded that defendant was initially arrested on suspicion of homicide rather than the unrelated misdemeanor charge.

4. Defendant was denied effective assistance of counsel. Trial counsel's failure to move to suppress the fruits of the DNA testing, when existing caselaw would have supported the motion, was an unreasonable decision. Defendant was prejudiced by trial counsel's errors; but for the admission of the fruits of the DNA test, there was almost nothing tying defendant to the victim's murder other than a neighbor's insistence that defendant may have been in the area during that time period.

Court of Appeals' judgment reversed; case remanded to the trial court for further proceedings.

Justice ZAHRA, dissenting, disagreed with the majority's conclusions that the DNA testing of defendant's pants constituted an unconstitutional search and that defendant's trial counsel was ineffective. Defendant did not have a reasonable expectation of privacy in his pants because they were lawfully in police custody pursuant to routine inventory procedures. As a result, the police did not conduct a "search" within the meaning of the Fourth Amendment of the federal Constitution when they forensically tested defendant's pants. Justice ZAHRA disagreed with the majority's suggestion that Const 1963, art 1, § 11, provides broader protection than the Fourth Amendment under these circumstances, finding no compelling reason to interpret the two provisions differently. Accordingly, Justice ZAHRA looked to extensive caselaw interpreting the Fourth Amendment to guide application of Const 1963, art 1, § 11, to this case, determining that the diminished privacy expectations of prisoners leads to the conclusion that defendant had no reasonable expectation of privacy in this instance. Justice ZAHRA did not agree with the majority's application of the trespass theory of the Fourth Amendment because it misconstrued the concept of trespass by holding that the police "trespassed" on an article of clothing that was already lawfully in their possession. Justice ZAHRA would have held that no search occurred, that the evidence was properly admitted, and that because defendant failed to demonstrate constitutional error, his claim of ineffective assistance of counsel also failed.

Justice HOOD did not participate because he was on the Court of Appeals panel that issued the decision under review.

# OPINION

Chief Justice:
Megan K. Cavanagh

Justices:
Brian K. Zahra
Richard H. Bernstein
Elizabeth M. Welch
Kyra H. Bolden
Kimberly A. Thomas
Noah P. Hood

FILED  July 30, 2026

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v                             No. 167154

DAVID HENRY SERGES,

      Defendant-Appellant.

_____

BEFORE THE ENTIRE BENCH (except HOOD, J.)

BERNSTEIN, J.

In this case, we consider whether the deoxyribonucleic acid (DNA) testing of defendant's pants, which occurred without either defendant's consent or a warrant, was an unreasonable search that violated Article 1, § 11 of Michigan's 1963 Constitution.  We hold that the DNA testing constituted a search and that this search was an unreasonable one because none of the exceptions to the warrant requirement applied.  Because we also hold that trial counsel was ineffective for failing to move to suppress the fruits of this

search, we reverse the judgment of the Court of Appeals and remand to the trial court for further proceedings.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

On November 27, 2017, a neighbor found an elderly widow dead in her home. Upon arrival, the police noted that there was a significant amount of blood at the scene of the crime; blood was found all over the furniture, fixtures, and floor, as well as on the door and in the garage. The medical examiner later determined that the victim had died from multiple blunt force traumas to her head. Given that the victim lived alone, a precise time and date of death could not be determined, although a window of several days was identified between when she was last seen and when her body was found. A single fingerprint was found at the crime scene, but no matches were found.

Although no information from the crime scene was found that identified defendant as a potential suspect, in the course of the police investigation, several individuals mentioned that they had seen defendant in the neighborhood during the period of time when the victim might have been killed. Defendant was a heroin addict who had made money by working odd jobs in the neighborhood, including housework and yardwork for the victim. The police took defendant into custody and questioned him. Although defendant admitted to knowing the victim, he denied harming her. Despite denying any involvement in the victim's murder, defendant was arrested on November 29.

There is some debate as to what charges defendant was arrested on. Previously, in 2016, an unrelated misdemeanor charge had been filed against defendant, and later that same year, a bench warrant had been issued after defendant failed to appear for arraignment

on that charge. There is a question of whether defendant was arrested in November 2017 for the unrelated misdemeanor charge, as the police report stated, or on suspicion of homicide, as the lead investigator, Detective Eric Freeman, later testified.

Following his arrest, defendant's effects were processed and taken into possession by the jail pending his release. Defendant was arraigned on November 30, 2017, for the misdemeanor charge. On the same day, Detective Freeman collected defendant's pants and other effects from the jail property room and took them into police custody. Detective Freeman did not seek either a search warrant or defendant's consent before taking defendant's effects into police custody. Following defendant's arrest, Detective Freeman did seek an arrest warrant in connection with the victim's murder, but the prosecutor denied the request for lack of evidence. Over a month after defendant was taken into custody, on January 19, 2018, the police department submitted a request to the Michigan State Police (MSP) to conduct a DNA test on defendant's black denim pants. Although defendant had been in custody since the end of November, the police had not obtained either a search warrant or defendant's consent before submitting the request for DNA testing. On March 8, 2018, the MSP issued a lab report finding that blood from a 15-millimeter by 3-millimeter stain on defendant's right front pant leg was consistent with the victim's DNA. On March 12, 2018, a first-degree murder arrest warrant was signed, and defendant was arraigned accordingly the next day.

At trial, defense counsel did not move to suppress the results of the DNA test. The defense theory was that the minuscule amount of blood found on defendant's pants did not logically connect him to the bloody crime scene; the spots on defendant's pants, which the MSP tested, were so small that they could not be seen with the naked eye. Defense counsel

3

argued that the victim was an aging diabetic who often bled from her feet and that defendant could have brushed against some of the victim's blood while doing chores inside the house. This first trial ended in a hung jury.

The prosecution sought another trial. At the second trial, defense counsel proceeded along much the same lines as in the first trial and did not move to suppress the results of the DNA test. Further, defense counsel suggested that the victim could have died as a result of an accident. This time, the jury convicted defendant of first-degree murder, MCL 750.316(1)(a). The trial court imposed a sentence of life without the possibility of parole.

Defendant then moved for a new trial or an evidentiary hearing, arguing in relevant part that the DNA evidence from his pants should have been suppressed on grounds that the DNA testing constituted an unconstitutional search and seizure and that trial counsel was ineffective for failing to move to suppress this evidence. The trial court denied defendant's motion in an order. Defendant appealed by right in the Court of Appeals and then moved to remand for an evidentiary hearing to develop his claim that trial counsel was ineffective. The Court of Appeals denied the motion "for failure to persuade the Court of the necessity of a remand at this time." *People v Serges*, unpublished order of the Court of Appeals, entered February 2, 2022 (Docket No. 355554). Defendant then renewed his motion to remand for an evidentiary hearing. This time the Court of Appeals granted the motion and remanded for an evidentiary hearing, limited to the issues of

> (1) the admissibility of the results of the forensic analysis of defendant's clothing worn when he was detained on or about November 30, 2017; and (2) whether trial counsel provided defendant effective assistance by not moving to suppress or exclude evidence of the forensic analysis of defendant's clothing. [*People v Serges*, unpublished order of the Court of Appeals, entered December 21, 2022 (Docket No. 355554).]

4

The Court of Appeals retained jurisdiction of the case.

The evidentiary hearing was held on February 1, 2023. Both trial counsel and Detective Freeman testified at the hearing. The trial court denied the motion for a new trial, finding that trial counsel had provided effective assistance, and the Court of Appeals affirmed defendant's conviction and sentence in a published opinion. *People v Serges*, 351 Mich App 88; 34 NW3d 550 (2024). Judge SWARTZLE concurred *dubitante* to opine that Michigan's jurisprudence on warrantless searches of property in the possession of the police was "unsettled." *Id*. at 154-155 (SWARTZLE, J., concurring *dubitante*).

Defendant sought leave to appeal in this Court. On May 30, 2025, we ordered oral argument on the application, directing the parties to address:

> (1) whether the defendant was unlawfully arrested such that his pants should be excluded as the result of an unreasonable seizure under US Const, Am IV or Mich Const 1963, art 1, § 11; (2) if the defendant was lawfully arrested, whether police violated the defendant's rights under US Const, Am IV or Mich Const 1963, art 1, § 11, by having his pants tested for DNA without a warrant while in possession of the pants due to the defendant's detention in jail, *People v Trudeau*, 385 Mich 276[; 187 NW2d 890] (1971); *People v Carr*, 370 Mich 251[; 121 NW2d 449] (1963); and (3) whether the defendant's trial attorney rendered ineffective assistance of counsel by failing to file a motion to suppress the evidence obtained as a result of the seizure and testing of the clothing. [*People v Serges*, ___ Mich ___, ___; 20 NW3d 864, 864 (2025).]

## II. STANDARD OF REVIEW

Defendant argues that trial counsel provided constitutionally ineffective assistance of counsel by not moving to suppress the results of the DNA test. "Whether a person has been denied effective assistance of counsel is a mixed question of fact and constitutional law." *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). While factual

5

findings are reviewed for clear error, questions of constitutional law are reviewed de novo. *Id*.; *Johnson v VanderKooi*, 509 Mich 524, 534; 983 NW2d 779 (2022).[1]

### III. UNREASONABLE SEARCH

To determine whether defendant was denied the effective assistance of counsel, we must first consider whether the DNA test was an unreasonable search. The Fourth Amendment of the United States Constitution preserves the people's right to be free from unreasonable searches and seizures. US Const, Am IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ."). The Michigan Constitution contains a similar provision. Const 1963, art 1, § 11 ("The person, houses, papers, [and] possessions . . . of every person shall be secure from unreasonable searches and seizures.").

"In interpreting our Constitution, we are not bound by the United States Supreme Court's interpretation of the United States Constitution, even where the language is identical." *People v Goldston*, 470 Mich 523, 534; 682 NW2d 479 (2004).[2] While this

---

[1] Because defendant failed to object to the admission of the results of the DNA test at trial, the dissent argues that defendant's claim of error is unpreserved and subject to plain-error review. However, this fails to take into consideration the fact that defendant also makes a claim of ineffective assistance of counsel. In other words, instead of simply assessing defendant's unreasonable-search claim for plain error, we assess defendant's unreasonable-search claim under the ineffective-assistance-of-counsel framework. We note that "[t]he standards for 'plain error' review and ineffective assistance of counsel are distinct, and therefore, a defendant can obtain relief for ineffective assistance of counsel even if he or she cannot demonstrate plain error." *People v Hughes*, 506 Mich 512, 523; 958 NW2d 98 (2020).

[2] Notably, the people of the state of Michigan recently approved a ballot proposal that amended our constitutional provision to clarify that it applies to "electronic data[] and electronic communications." Proposal 20-2, effective December 19, 2020. Although we acknowledge that this amendment postdates the alleged conduct in this case, it is

6

Court has typically construed Const 1963, art 1, § 11, as providing the same protections as the Fourth Amendment, "[w]e have, on occasion, construed the Michigan Constitution in a manner which results in greater rights than those given by the federal constitution, . . . and where there is compelling reason, we will undoubtedly do so again." *People v Nash*, 418 Mich 196, 214-215; 341 NW2d 439 (1983) (opinion by BRICKLEY, J.); see also *People v Slaughter*, 489 Mich 302, 311; 803 NW2d 171 (2011). Although *Nash*'s "compelling reason" language has sometimes been interpreted as a hurdle that must be cleared before interpreting the Michigan Constitution differently, we stressed in *Sitz v Dep't of State Police*, 443 Mich 744, 758; 506 NW2d 209 (1993), that this language "should not be understood as establishing a conclusive presumption artificially linking state constitutional interpretation to federal law." Rather, *Nash* "compels neither the acceptance of federal interpretation nor its rejection." *Id*. at 758-759. Instead, we must "independently analyze our state Constitution to ensure that our citizens are receiving the measure of the protections that *they* created[.]" *People v Tanner*, 496 Mich 199, 222 n 15; 853 NW2d 653 (2014). In doing so, we acknowledge that "the history of our jurisprudence" and

---

noteworthy that the language of Const 1963, art 1, § 11, has been explicitly broadened in recent years, as it means that many of the factors suggesting that our state Constitution confers greater protection than its federal counterpart are present here. See *People v Tanner*, 496 Mich 199, 223 n 17; 853 NW2d 653 (2014) (listing factors to consider when analyzing our state Constitution independently from the federal Constitution, including significant textual differences, state constitutional history, state law preexisting the adoption of the relevant state constitutional provision, and matters of peculiar state interest).

While the dissent suggests that the recent amendment simply aligns Const 1963, art 1, § 11, with federal jurisprudence protecting electronic data, the adoption of this explicit language in our state constitutional provision does more than just that, as it ensures that even if federal jurisprudence changes, the rights of Michiganders remain protected.

7

circumstances surrounding the adoption of the provision can form a basis for extending greater protections under our constitutional provision. *Sitz*, 443 Mich at 776-777.[3]

In determining whether an unreasonable search has occurred, the threshold question is whether a search has taken place, because neither the Fourth Amendment nor Const 1963, art 1, § 11, is implicated absent one. In *Johnson*, we reaffirmed the viability of the trespass approach for determining what constitutes a search. Under the trespass approach, "a search occurs when the government 'occupie[s] private property for the purpose of obtaining information.' " *Johnson*, 509 Mich at 535 (alteration in *Johnson*), quoting *United States v Jones*, 565 US 400, 404; 132 S Ct 945; 8 L Ed 2d 911 (2012). In other words, "we consider whether there was a physical trespass on a constitutionally protected area and whether there was an attempt to obtain information." *Johnson*, 509 Mich at 537. The trespass approach exists independently of and alongside the approach articulated in *Katz v United States*, 389 US 347; 88 S Ct 507; 19 L Ed 2d 576 (1967), under which "a Fourth Amendment search occurs when the government violates a subjective expectation of privacy that society recognizes as reasonable." *Kyllo v United States*, 533 US 27, 33; 121 S Ct 2038; 150 L Ed 2d 94 (2001), citing *Katz*, 389 US at 361 (HARLAN, J., concurring).

---

[3] The dissent worries that we have abandoned the historical analysis in *Nash*, 418 Mich 196 (opinion by BRICKLEY, J.), which the dissent understands as simply concluding that the readoption of Article 1, § 11, at the 1961 Constitutional Convention represented "no change," *id*. at 213. However, this misunderstands the complicated history that *Nash* uncovered. As highlighted in *Sitz*, when read in full, *Nash* also stated that "this Court 'created a body of state constitutional search and seizure law and adopted an exclusionary rule, all before either was subject to a federal floor,' " *Sitz*, 443 Mich at 758, quoting *Nash*, 418 Mich at 214, and the adoption of the 1961 Constitution did nothing to abrogate that evolving body of state law.

8

Applying the trespass approach leads us to the simple conclusion that the DNA testing of defendant's pants was a search. A defendant's effects or possessions, here his pants, are no less constitutionally protected than his own person, and the DNA testing was ordered by the police to obtain information.[4] Because the trespass approach exists alongside the reasonable-expectation-of-privacy approach, once we have concluded that DNA testing is a search under the trespass approach, there is no need to consider whether and to what degree a defendant has a reasonable expectation of privacy either in his own pants that were worn in public or any blood found on those pants. As we have previously noted: "One virtue of the Fourth Amendment's property-rights baseline is that it keeps easy cases easy." *Johnson*, 509 Mich at 537 (quotation marks omitted), quoting *Florida v Jardines*, 569 US 1, 11; 133 S Ct 1409; 185 L Ed 2d 495 (2013). Because we have held that the Michigan Constitution provides at least as much protection as the Fourth Amendment, *Slaughter*, 489 Mich at 311, the DNA testing of defendant's pants was equally a search under Const 1963, art 1, § 11.

Of course, that the DNA testing of defendant's pants constituted a search does not end our inquiry. "The Fourth Amendment is not, of course, a guarantee against *all* searches and seizures, but only against *unreasonable* searches and seizures." *United States v*

---

[4] The prosecution asserts that the DNA testing was not a search under the trespass approach because another person's biological material located on the exterior of a personal effect is not a constitutionally protected area. But that argument gets the analysis backward. Whether something is a constitutionally protected area does not depend on the result of a subsequent inspection of that area. See *People v LoCicero (After Remand)*, 453 Mich 496, 501; 556 NW2d 498 (1996) ("A search is not to be made legal by what it turns up.") (quotation marks and citation omitted). In other words, what matters is that defendant's personal effects are constitutionally protected, and the results of a search do not alter that conclusion.

*Sharpe*, 470 US 675, 682; 105 S Ct 1568; 84 L Ed 2d 605 (1985).  By its plain language, the protections of Const 1963, art 1, § 11, likewise extend only to searches and seizures that are unreasonable.  "[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment— subject only to a few specifically established and well-delineated exceptions."  *Katz*, 389 US at 357 (citations omitted).  These exceptions are "jealously and carefully drawn," and "the burden is on those seeking the exemption to show the need for it."  *Coolidge v New Hampshire*, 403 US 443, 455; 91 S Ct 2022; 29 L Ed 2d 564 (1971) (quotation marks, citations, and alteration omitted).

Here, the prosecution argues that either the inventory-search exception or the search-incident-to-arrest exception applies.  Both are recognized by the Supreme Court of the United States and this Court as well-defined exceptions to the warrant requirement.  *South Dakota v Opperman*, 428 US 364, 372; 96 S Ct 3092; 49 L Ed 2d 1000 (1976) (inventory-search exception); *People v Toohey*, 438 Mich 265, 281-284; 475 NW2d 16 (1991) (same); *Virginia v Moore*, 553 US 164, 176-177; 128 S Ct 1598; 170 L Ed 2d 559 (2008) (search-incident-to-arrest exception); *People v Gonzales*, 356 Mich 247, 253-254; 97 NW2d 16 (1959) (same).  We address each exception in turn.

An inventory search is "an incidental administrative step following arrest and preceding incarceration."  *Illinois v Lafayette*, 462 US 640, 644; 103 S Ct 2605; 77 L Ed 2d 65 (1983).  The Supreme Court has explained the justification for allowing warrantless searches under these circumstances as follows:

> A range of governmental interests supports an inventory process.  It is not unheard of for persons employed in police activities to steal property taken from arrested persons; similarly, arrested persons have been known to make

10

false claims regarding what was taken from their possession at the stationhouse. A standardized procedure for making a list or inventory as soon as reasonable after reaching the stationhouse not only deters false claims but also inhibits theft or careless handling of articles taken from the arrested person. Arrested persons have also been known to injure themselves—or others—with belts, knives, drugs, or other items on their person while being detained. . . . The bare recital of these mundane realities justifies reasonable measures by police to limit these risks . . . . Examining all the items removed from the arrestee's person or possession and listing or inventorying them is an entirely reasonable administrative procedure. [*Id*. at 646.]

The Supreme Court thus held that "it is not 'unreasonable' for police, as part of the routine procedure incident to incarcerating an arrested person, to search any container or article in his possession, in accordance with established inventory procedures." *Id*. at 648.[5] This

---

[5] While the dissent cites several examples of the ways in which detainees' privacy rights are curtailed, we find these examples inapt. Each case cited by the dissent involves an administrative or safety-related search, yet none suggests that officials may subject a lawfully seized object to additional scrutiny unrelated to institutional safety. In contrast, our caselaw establishes that an individual generally maintains a privacy interest in objects that are lawfully in the possession of police. Compare *Hughes*, 506 Mich at 530 (holding that the police, though lawfully in possession of a cell phone, may not search the phone beyond the scope of the existing warrant because "[t]he authority to seize an item does not necessarily eliminate one's expectation of privacy in that item and therefore allow the police to search that item without limitation"); *People v Custer*, 465 Mich 319, 342; 630 NW2d 870 (2001) (opinion by MARKMAN, J.) ("[W]e do *not* conclude that, once the police lawfully seize an object from an individual, that individual's reasonable expectation of privacy in that object is *altogether* lost."); and *Gonzales*, 356 Mich at 253 (holding that "the fact of a lawful arrest does not, in our view, automatically render constitutional any contemporaneous search and seizure"), with *Hudson v Palmer*, 468 US 517, 528; 104 S Ct 3194; 82 L Ed 2d 393 (1984) ("We are satisfied that society would insist that the prisoner's expectation of privacy always yield to what must be considered the paramount interest in *institutional security*.") (emphasis added); *Bell v Wolfish*, 441 US 520, 559-560; 99 S Ct 1861; 60 L Ed 2d 447 (1979) ("A detention facility is a unique place fraught with serious security dangers. Smuggling of money, drugs, weapons, and other contraband is all too common an occurrence. . . . Balancing the significant and legitimate *security interests of the institution* against the privacy interests of the inmates, we conclude that they can [strip-search detainees].") (emphasis added); *Florence v Bd of Chosen Freeholders of Co of Burlington*, 566 US 318, 338-339; 132 S Ct 1510; 182 L Ed 2d 566 (2012) (allowing strip searches of low-level offenders who were to be released into the general population for the

11

Court has subsequently emphasized the administrative, as opposed to investigative, nature of these inventory searches. See *Toohey*, 438 Mich at 275-276.

The difficulty with the prosecution's argument in this case is that DNA testing is not part of established *inventory* procedure. Here, the police collected defendant's effects for an *investigative* search for which they had no warrant. There is no indication in the record, and there could not be, that DNA testing of a defendant's effects is standardized procedure when an individual is arrested and detained at jail.[6] DNA testing is also not necessary for "the protection of the owner's property while it remains in police custody, the protection of the police against claims or disputes over lost or stolen property, and the protection of the police from potential danger[.]" *Opperman*, 428 US at 369 (citations omitted). The prosecution does not claim otherwise. The DNA testing of defendant's

purpose of reducing "danger to everyone in the facility, including the less serious offenders themselves"); and *Block v Rutherford*, 468 US 576, 591; 104 S Ct 3227; 82 L Ed 2d 438 (1984) ("The security concerns that we held justified the same restriction in *Wolfish . . .* are no less compelling here.").

In short, though the cases cited by the dissent establish that jail and prison officials may search a detainee and lawfully seize and inventory possessions, nothing about these examples suggests that they may go beyond the limited ambit justified by the goals of institutional safety and administrative order. Simple procedures for inventory and impoundment do not justify invasive, investigative forensic DNA testing. Indeed, much like the prosecution, the dissent fails to cite any authority for the proposition that DNA testing is part of any established inventory procedure. Cf. *People v Robinson*, 388 Mich 630, 632-633; 202 NW2d 288 (1972).

[6] Unlike in *Maryland v King*, 569 US 435, 441; 133 S Ct 1958; 186 L Ed 2d 1 (2013), there is no indication here that DNA testing was conducted as a matter of course by jail personnel when defendant was processed for detention. To the extent that the prosecution argues that the DNA testing here is analogous to fingerprinting, the latter is typically part of a routine booking process, whereas DNA testing is not. See *id*. at 458, 466 (describing fingerprinting as "an accepted means of processing an arrestee into custody" and "a legitimate booking procedure that is reasonable under the Fourth Amendment").

effects *weeks* later by the police department did not and could not contribute to any interests in safeguarding defendant's property or protecting the police from danger. Additionally, the record is clear that Detective Freeman moved defendant's effects from the jail property room into police evidence, where they were later sent out to be tested by the MSP for the victim's blood. Any inventory procedure was necessarily complete when defendant's effects were taken from the jail property room. Accordingly, we conclude that the DNA testing of defendant's pants could not have been justified under the inventory-search exception to the warrant requirement.

With respect to the search-incident-to-arrest exception, some factual clarification is necessary at the outset. As an initial matter, the trial court found that defendant was initially arrested and detained on the unrelated misdemeanor charge. See *Serges*, 351 Mich App at 153 (SWARTZLE, J., concurring *dubitante*). We agree with the concurrence *dubitante* that we must accept this factual finding absent clear error. In initially denying defendant's motion for a new trial or evidentiary hearing, the trial court noted that the prosecutor had stipulated to the facts as presented by defendant in his motion. Specifically, the trial court noted that "[d]efendant was arrested because of an outstanding warrant relating to a city ordinance violation." Later, at the evidentiary hearing, the trial court continued to note that "the pants are ones that [defendant] was wearing when he was taken into custody on an unrelated matter. He had an outstanding warrant on another case." Though the Court of Appeals majority concluded that defendant was instead initially arrested on suspicion of homicide, seemingly based on Detective Freeman's testimony at the evidentiary hearing, this testimony conflicts with all other evidence in the record, and the trial court's contrary finding is entitled to deference given its superior ability to assess witness credibility. See

13

MCR 2.613(C); MCR 6.001(D). Because a trial court's findings of fact are reviewed for clear error, MCR 2.613(C), the Court of Appeals majority necessarily erred by substituting its judgment for that of the trial court.

This clarification provides necessary context to the caselaw interpreting this exception to the warrant requirement. The Supreme Court has held that the search-incident-to-arrest exception "permits warrantless searches incident to custodial arrests, and has traditionally been justified by the reasonableness of searching for weapons, instruments of escape, and evidence of crime when a person is taken into official custody and lawfully detained." *United States v Edwards*, 415 US 800, 802-803; 94 S Ct 1234; 39 L Ed 2d 771 (1974) (citations omitted). To the extent that most of the justifications underlying this exception overlap with those underlying the inventory-search exception, we again note that DNA testing of a defendant's effects does nothing to further the interests of public safety. See also *Preston v United States*, 376 US 364, 367; 84 S Ct 881; 11 L Ed 2d 777 (1964) ("But these justifications are absent where a search is remote in time or place from the arrest.").[7] The prosecution does not argue otherwise. Instead, the prosecution focuses on the major point of difference between these two exceptions: that a search incident to arrest can be justified by the reasonableness of searching for evidence of crime.

This argument has surface appeal—the DNA testing was, after all, conducted to search for evidence linking defendant to the victim's murder. The prosecution relies primarily on *Edwards* in support of this argument. In *Edwards*, the respondent was arrested

---

[7] Given that the search took place over a month after defendant was arrested, it is also difficult to understand how the search could truly be "incident" to the arrest. See *Preston*, 376 US at 367 ("Once an accused is under arrest and in custody, then a search made at another place, without a warrant, is simply not incident to the arrest.").

and charged with attempting to break into a post office. The police had probable cause to believe that paint chips linking the respondent to the crime would be found on his clothing. *Edwards*, 415 US at 802. Although the search was delayed by one day until substitute clothing could be purchased for the respondent to change into, the Supreme Court held that this was "a normal incident of a custodial arrest" and that this reasonable delay did not place any greater burden or imposition on the respondent than if his effects had been immediately searched. *Id*. at 805; see also *People v Hughes*, 506 Mich 512, 531; 958 NW2d 98 (2020) (reading *Edwards* as holding "that a lawful search of an item on an arrestee's person immediately after arrest was *already* reasonable" as a search incident to arrest "and that a reasonable delay in conducting that permissible search did not render the search unreasonable"). The Supreme Court in *Edwards* also relied on prior caselaw, which had involved the search of a car after the defendant's arrest: "The warrantless search and seizure were sustained because they were 'closely related to the reason petitioner was arrested, the reason his car had been impounded, and the reason it was being retained.' " *Edwards*, 415 US at 806, quoting *Cooper v California*, 386 US 58, 61; 87 S Ct 788; 17 L Ed 2d 730 (1967).

And therein lies the main difference that distinguishes *Edwards* and *Cooper* from the case before us: unlike this case, the individuals in both *Edwards* and *Cooper* were searched for evidence of the *same crime* for which they were arrested. This was key to the justification for the warrantless search and seizure in *Cooper*, on which *Edwards* relied: the search was closely related to the *reason* the petitioner was arrested. *Edwards*, 415 Mich at 806; *Cooper*, 386 US at 61-62. The Supreme Court has since reaffirmed that this justification for a search incident to arrest is limited in scope to a search for the "evidence

15

of the offense of arrest . . . ." *Arizona v Gant*, 556 US 332, 339; 129 S Ct 1710; 173 L Ed 2d 485 (2009). As the trial court found, defendant was arrested on an unrelated misdemeanor charge, but his effects were instead searched for evidence of a *different* crime.

Accordingly, neither *Edwards* nor *Cooper* compels the conclusion that the search was reasonable. Instead, we conclude that the result here is dictated by prior decisions from this Court. Under Const 1963, art 1, § 11, where a defendant has been arrested and incarcerated for one crime, the search-incident-to-arrest exception does not apply when the defendant is then searched for evidence of another crime.[8] In *Carr*, 370 Mich at 253-254, the defendant was already serving a jail sentence when he was questioned by the police about another crime. The defendant's car, which had been stored in the jail parking lot, was then searched without a warrant. Evidence taken from the car resulted in the defendant being connected with the other crime and eventually being convicted of it. *Id*. This Court held that the search was in patent violation of Const 1908, art 2, § 10,[9] and that the fruits of that search were thus inadmissible. *Id*. at 255-256. This Court cautioned that the

---

[8] To the extent the dissent suggests that the DNA test was appropriate because the police may have previously conducted a lawful search of defendant incident to his arrest and booking, we disagree. Language in *Carr*, *Trudeau*, and *Edwards* demonstrates that, as in this case, the search-incident-to-arrest exception simply does not extend to the search of a defendant for evidence of a crime different from the one for which they were arrested. Accord *Reeves v State*, 599 P2d 727, 736 (Alas, 1979); *State v Kaluna*, 55 Hawaii 361, 374; 520 P2d 51 (1974).

[9] This provision stated, "The person, houses, papers and possessions of every person shall be secure from unreasonable searches and seizures." Const 1908, art 2, § 10. This language is materially unchanged in Const 1963, art 1, § 11, though as noted earlier in this opinion, our Constitution has since been amended to encompass "electronic data[] and electronic communications" as protected. Proposal 20-2, effective December 19, 2020.

[d]efendant was not stripped of his civil rights and his constitutional safeguards merely because he was serving a sentence in the county jail for an unrelated misdemeanor. It would be a dangerous rule of law and an invitation to circumvent the constitutional guaranty against unreasonable search and seizure were the citizen convicted of a misdemeanor and in jail, possibly in default of payment of a fine, to be stripped of all his civil liberties. [*Id*. at 255.][10]

This Court noted that this holding did not prevent an officer from conducting a warrantless search following a lawful arrest "for articles that may be used in evidence to prove the charge on which the prisoner has been arrested . . . ." *Id*. at 255-256.[11]

Similarly, in *Trudeau*, 385 Mich at 278, the police visited the defendant while he was in jail on one charge and took his shoe to connect him to another crime. An imprint made from that shoe was later used to convict the defendant of second-degree murder and breaking and entering. At trial, a forensic expert had testified that it took a week to make comparisons between the imprint of the defendant's shoe and a partial heel print found at the scene of the murder. *Id*. at 278-279.

> From [this] testimony, it is apparent that [the officer] had no probable cause to believe that the seized shoes were evidence linked to the crime. This was not established until the expert made his week-long examination of them. If [the defendant] had not been in custody, the [police] would have had to obtain a warrant to search and seize an article of his clothing. [*Id*. at 280.]

---

[10] We have also noted in other contexts that the mere possession of a lawfully seized item belonging to a suspect does not authorize every further manipulation or examination of that item. See *Custer*, 465 Mich at 334 n 4 (opinion by MARKMAN, J.).

[11] The dissent distinguishes this case on the grounds that the *Carr* defendant "retained both his property-based rights and a reasonable expectation of privacy in the inviolability of his vehicle." However, just as the *Carr* defendant had his car in jail safekeeping and would have expected that his vehicle would be returned to him on release, defendant's personal effects, including his pants, were in jail safekeeping, and he would expect them to be returned to him on release as well.

17

This Court relied on *Carr* in noting that the "[d]efendant did not lose his civil rights or liberties while he was in police custody awaiting trial on another charge." *Id*. at 281.

Defendant in this case was arrested with respect to one crime, and his effects were then searched without a warrant in connection with another crime; as stated in *Carr*, such a search can only be justified under the search-incident-to-arrest exception to the warrant requirement "to prove the charge on which the prisoner has been arrested . . . ." *Carr*, 370 Mich at 256.[12] This understanding of the exception is consistent with the Supreme Court's holdings in *Edwards* and *Cooper*. To the extent that *Carr* and *Trudeau* go further in clarifying that this exception only allows the state to search for evidence linking a defendant to the charge for which he was lawfully arrested, we note that the *Carr* holding was explicitly grounded not in the Fourth Amendment, but in our analogous state constitutional provision. *Id*. We thus hold that the search here was made in violation of Const 1963, art 1, § 11, consistently with our holding in *Carr*.

In sum, we hold that the DNA testing of defendant's effects constituted a search under the trespass approach, and that it was an unreasonable search in violation of Const 1963, art 1, § 11, because it took place without a warrant, and the prosecution has not met

---

[12] The Court of Appeals majority held that *Carr* and *Trudeau* were distinguishable on the basis that, in those cases, "the items searched remained in the defendants' respective custody and control," whereas in this case, defendant's effects had already been seized by the jail, thereby ridding defendant of any reasonable expectation of privacy in his effects. *Serges*, 351 Mich App at 116 (opinion of the Court). We disagree. First, we note that the reasonable-expectation-of-privacy test is not relevant where we have found that there is a search on trespass grounds. Second, just as the defendant in *Carr* retained a reasonable expectation of privacy in his car while it was stored in a jail lot during his incarceration, defendant here also retained a reasonable expectation of privacy in his personal effects while they were stored in the jail.

18

its burden of establishing that a warrant exception applied.[13]  Having found that an unconstitutional search took place, we now turn to the question of what relief, if any, is warranted.  Given that defendant has raised a related claim of ineffective assistance of counsel, arguing that trial counsel was ineffective for failing to challenge the admission of the fruits of this unconstitutional search, we assess defendant's claim through this lens.

## IV.  INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL

The Sixth Amendment guarantees a criminal defendant the right to the "Assistance of Counsel."  US Const, Am VI.  The Supreme Court has held that "the right to counsel is the right to the effective assistance of counsel."  *McMann v Richardson*, 397 US 759, 771 n 14; 90 S Ct 1441; 25 L Ed 2d 763 (1970).  In order to establish a claim of ineffective assistance of counsel, a defendant must show both that "counsel's representation fell below an objective standard of reasonableness" and that "any deficiencies in counsel's performance [are] prejudicial to the defense . . . ."  *Strickland v Washington*, 466 US 668, 688, 692; 104 S Ct 2052; 80 L Ed 2d 674 (1984).

With respect to the performance prong, the Supreme Court has declined to issue more specific guidelines for reviewing attorney performance, instead holding that "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms."  *Id*. at 688.  Analysis under this prong is highly deferential, and "the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy."  *Id*. at 689 (quotation marks and citation

---

[13] Given our conclusion that the DNA testing here constituted an unreasonable search, we decline to address defendant's challenge to the seizure of his effects.

19

omitted). Whether a choice constitutes sound trial strategy depends on whether an attorney has engaged in adequate preparation beforehand: "In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id*. at 691.

Trial counsel alleged that he did not move to suppress this evidence under the theory that, given the nature of the crime scene, the minuscule amount of the victim's blood found on defendant's pants did not logically connect him to the murder. Trial counsel also explained that he had assumed there was no issue with the testing of the pants given their seizure incident to defendant's arrest. Trial counsel pointed to the fact that defendant's first trial ended in a hung jury in support of the argument that this strategy was reasonable. However, outcome alone does not demonstrate that trial counsel's performance was reasonable; because the outcome in a criminal trial is dictated by whether the prosecution is able to bear the burden of proof beyond a reasonable doubt, the result alone does not speak just to trial counsel's performance, as it implicates the prosecution's performance as well.

Although trial counsel's purported strategy might abide by some logic,[14] this quickly falls apart when one considers the options that trial counsel had. Trial counsel could have chosen either to proceed and explain to a jury why the victim's blood appeared on defendant's pants, or to attempt to exclude the results of the DNA test and explain to a jury that no physical evidence connected defendant to the victim's murder. It is

---

[14] Even this premise rests on shaky grounds, given that trial counsel also attempted to argue that the victim's death was accidental and even attempted to conduct a live experiment in the middle of defendant's second trial to show how the victim may have been harmed.

unreasonable both to fail to seek exclusion of the results of the search, when trial counsel could have still fallen back on his chosen trial strategy if a motion to suppress was denied, and to *choose* a more damning factual scenario to present to the jury.[15]  Therefore, trial counsel's failure to move to suppress the fruits of the DNA testing, when existing caselaw would have supported the motion, was an unreasonable decision.

With respect to the prejudice prong, the Supreme Court has held that "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 US at 694.  The Supreme Court has also noted that "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Id*. at 696.

Defendant was prejudiced by trial counsel's errors; but for the admission of the fruits of the DNA test, there was almost nothing tying defendant to the victim's murder other than a neighbor's insistence that defendant may have been in the area during that time period.  No evidence at the crime scene connected defendant to the crime, and the suspected murder weapons contained neither defendant's fingerprints nor his DNA.  Without this evidence, defendant's conviction could not have been said to be even weakly supported by the record.

---

[15] That this approach is deficient is made all the more apparent by trial counsel's apparent failure to research the legal issue and, for example, review relevant opinions such as *Carr* and *Trudeau*.  See *People v Trakhtenberg*, 493 Mich 38, 52; 826 NW2d 136 (2012) (explaining that it is ineffective to make "strategic choices . . . after less than complete investigation") (quotation marks and citation omitted).

Accordingly, we hold that defendant was denied the effective assistance of counsel.

## V. CONCLUSION

We hold that the DNA testing of defendant's effects without a warrant or his consent constituted an unreasonable search under Article 1, § 11 of Michigan's 1963 Constitution. A DNA test is simply not part of a reasonable inventory search, nor is it justified under the search-incident-to-arrest exception to the warrant requirement, especially when the arrest was for a charge unrelated to the reason for the search. Moreover, we conclude that trial counsel's failure to move to suppress the fruits of this unconstitutional search was deficient performance where it was not preceded by adequate investigation or accompanied by a reasonable trial strategy. Because this deficient performance was also prejudicial, as the DNA evidence was the only physical evidence that connected defendant to the scene of the crime, we hold that trial counsel was ineffective. Accordingly, we reverse the judgment of the Court of Appeals and remand this case to the trial court for proceedings not inconsistent with this opinion.

Richard H. Bernstein
Megan K. Cavanagh
Elizabeth M. Welch
Kyra H. Bolden
Kimberly A. Thomas

22

# STATE OF MICHIGAN

## SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

    Plaintiff-Appellee,

v                             No. 167154

DAVID HENRY SERGES,

    Defendant-Appellant.

_____

ZAHRA, J. (*dissenting*).

In September 2020, a Genesee County jury convicted defendant of first-degree premeditated murder for the November 2017 killing of a woman who occasionally hired him to do odd jobs for her. While defendant was jailed on unrelated misdemeanor charges, police forensically tested his clothing, which was properly in the possession of the county jail. Testing revealed the discovery of the decedent's deoxyribonucleic acid (DNA) in a small spot of blood on defendant's pants. This evidence was presented at trial, and defendant was convicted.[1]

While on direct appeal, the Court of Appeals remanded the case to the trial court for an evidentiary hearing on ineffective assistance of trial counsel.[2] The trial court held a

---

[1] Defendant was tried twice. His first trial resulted in a deadlocked jury. He was convicted at a second trial.

[2] *People v Serges*, unpublished order of the Court of Appeals, entered December 21, 2022 (Docket No. 355554).

*Ginther* hearing[3] and concluded that trial counsel did not perform ineffectively.[4]  In a published opinion issued on April 4, 2024, the Court of Appeals affirmed defendant's conviction.[5]  Defendant filed an application for leave to appeal in this Court.

The question before us is whether the police violated defendant's constitutional right to be free from unreasonable searches and seizures when they forensically tested his pants for evidence of a murder while the pants were in police custody pursuant to his lawful arrest.  The majority opinion chooses not to focus on whether defendant had a reasonable expectation of privacy in pants that were not in his possession or control.  Perhaps this is because it is difficult to see how someone would have such an expectation of privacy in a garment no longer in his possession or control.[6]  The majority opinion holds that defendant's right to be free from unreasonable searches under Article 1, § 11 of the 1963 Michigan Constitution was violated because the police committed a trespassory search of his pants.

I fail to see any trespass in this case.  As a threshold matter, the majority improperly erodes the longstanding connection between Article 1, § 11 of our Michigan Constitution and the Fourth Amendment of the United States Constitution.  Given our well-established caselaw holding that protection from unreasonable searches and seizures under the Michigan Constitution is the same as the protection afforded under the Fourth Amendment

---

[3] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

[4] *People v Serges*, unpublished order of the Genesee Circuit Court, issued July 28, 2023 (Docket No. 18-042951).

[5] *People v Serges*, 351 Mich App 88; 34 NW3d 550 (2024).

[6] See Part II(C) of this dissenting opinion.

2

to the federal Constitution, the Court cannot simply expand the protections available under our state Constitution merely because a majority of this Court deems it good public policy to do so.

On the merits, the majority opinion stumbles when it applies the trespass theory of Fourth Amendment jurisprudence to defendant's pants, which were lawfully in police custody when the testing was performed. A basic principle of trespass is that the person claiming trespass has a right to control the property allegedly subject to the trespass. Since defendant's pants were properly under the control of law enforcement, there is no trespass resulting from the forensic analysis. As the majority opinion definitively observes, defendant was lawfully in custody on a charge unrelated to the murder that he was convicted of committing. The parties do not dispute that, as a result of his arrest and booking, the police had lawful custody of the pants at the time of the forensic examination. Caselaw interpreting Fourth Amendment protections under our federal Constitution confirms that an arrestee's expectation of privacy—including with respect to personal effects—is significantly diminished relative to the expectation of privacy possessed by the general public. It likewise follows that once a person is incarcerated, their ability to control personal effects retained by law enforcement as a result of one's incarceration is greatly diminished, if not outright eliminated. Applying this principle to the facts of this case, defendant did not have a reasonable expectation of privacy in, or an ability to control, his pants at the time they were forensically tested. Accordingly, the police did not conduct a "search" within the meaning of the Fourth Amendment of the federal Constitution or Article 1, § 11 of the Michigan Constitution. The results of the forensic analysis were properly admitted at trial. I dissent from the Court's holding to the contrary.

3

## I. STANDARD OF REVIEW

"To preserve an evidentiary issue for review, a party opposing the admission of evidence must object at trial and specify the same ground for objection that it asserts on appeal."[7] In this case, defendant did not move at trial to suppress or otherwise object to the admission of the evidence related to the victim's blood found on his pants. Consequently, he failed to preserve this issue. This Court reviews unpreserved claims of constitutional error for plain error affecting substantial rights.[8] A claim of error is forfeited under the plain-error rule unless the defendant can show actual prejudice.[9] "Reversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence."[10] Questions of constitutional law are reviewed de novo.[11]

Defendant also raises a claim of ineffective assistance of counsel. "Whether a defendant has been denied the effective assistance of counsel is a mixed question of law

---

[7] *People v Thorpe*, 504 Mich 230, 252; 934 NW2d 693 (2019).

[8] *People v Pipes*, 475 Mich 267, 274; 715 NW2d 290 (2006).

[9] *Id.*

[10] *People v Randolph*, 502 Mich 1, 10; 917 NW2d 249 (2018) (quotation marks and citation omitted).

[11] *Sidun v Wayne Co Treasurer*, 481 Mich 503, 508; 751 NW2d 453 (2008).

and fact."[12]   A court must first make factual findings and then must determine whether those facts amount to constitutionally ineffective assistance of counsel.[13]

## II.  ANALYSIS

### A.  ARTICLE 1, § 11 OF MICHIGAN'S 1963 CONSTITUTION PROVIDES THE SAME PROTECTIONS AS THE FOURTH AMENDMENT OF THE FEDERAL CONSTITUTION

The majority opinion begins its analysis of this case by discussing the relationship between the search-and-seizure provision of the Fourth Amendment of the United States Constitution[14] and the analogous provision of the Michigan Constitution in Article 1, § 11.[15]   Although the majority opinion acknowledges that "this Court has typically construed Const 1963, art 1, § 11, as providing the same protections as the Fourth Amendment," the majority opinion fails to give this statement any weight.  Instead, the majority opinion minimizes this doctrine by choosing to stress that, " '[i]n interpreting our Constitution, we are not bound by the United States Supreme Court's interpretation of the United States Constitution, even where the language is identical,' "[16] and by noting that there is not " 'a conclusive presumption artificially linking state constitutional

---

[12] *People v Riley (After Remand)*, 468 Mich 135, 139; 659 NW2d 611 (2003).

[13] *Id*.

[14] US Const, Am IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . .").

[15] Const 1963, art 1, § 11 ("The person, houses, papers, [and] possessions . . . of every person shall be secure from unreasonable searches and seizures.").

[16] Quoting *People v Goldston*, 470 Mich 523, 534; 682 NW2d 479 (2004).

5

interpretation to federal law.' "[17]  The majority opinion also highlights the December 19, 2020 amendment to Article 1, § 11, which added protection for "electronic data[] and electronic communications."[18]  Tucked in a footnote, the majority opinion proposes—without affirmatively holding—that because "the language of Const 1963, art 1, § 11, has been explicitly broadened in recent years, . . . many of the factors suggesting that our state Constitution confers greater protection than its federal counterpart are present here."

The majority opinion's subtle hint at uncoupling Article 1, § 11, from the Fourth Amendment of the federal Constitution defies deeply entrenched caselaw.  Among the most affirmed tenets of our criminal-law jurisprudence is the holding that the protections of Article 1, § 11, "have been construed as coextensive with its federal counterpart."[19]  In

---

[17] Quoting *Sitz v Dep't of State Police*, 443 Mich 744, 758; 506 NW2d 209 (1993).

[18] Proposal 20-2, effective December 19, 2020.

[19] *People v Mead*, 503 Mich 205, 212; 931 NW2d 557 (2019).  See also *People v Collins*, 438 Mich 8, 27; 475 NW2d 684 (1991) ("[T]here is no evidence that those who later framed and adopted the 1963 Constitution had any intention of expanding the protection provided under Michigan's search and seizure provision beyond that secured by the Fourth Amendment of the federal constitution."); *People v Chapman*, 425 Mich 245, 252; 387 NW2d 835 (1986) ("The search and seizure provision of the Michigan Constitution, Const 1963, art 1, § 11, affords defendant no greater rights upon which to support the suppression than the Fourth Amendment."); *People v Catania*, 427 Mich 447, 466; 398 NW2d 343 (1986) ("There is no basis in this case for holding that the Michigan Constitution, art 1, § 11, permits greater protection than the United States Constitution."); *People v Smith*, 420 Mich 1, 7; 360 NW2d 841 (1984) ("[T]here is nothing in the differences in language between art 1, § 11 and Am IV that requires or suggests the adoption of the 'automatic standing' test."); *People v Perlos*, 436 Mich 305, 313 n 7; 462 NW2d 310 (1990) ("Unless there is a compelling reason to afford greater protection under the Michigan Constitution, the Michigan and federal provisions will be treated as affording the same protections."); *People v Custer*, 465 Mich 319, 326 n 2; 630 NW2d 870 (2001) (opinion by MARKMAN, J.) ("Michigan's constitutional prohibition against unreasonable searches and seizures is to be construed to provide the same protection as that secured by the Fourth Amendment of the federal constitution, absent[] compelling reason to impose a different interpretation.") (quotation marks, citation, and brackets omitted); *People v Hammerlund*, 504 Mich 442,

6

*People v Nash*,[20] which the majority opinion cites, this Court reviewed the history of the search-and-seizure provision in Michigan's Constitution, including the debates at the 1961 Constitutional Convention over whether to amend the section to "allow for the possibility of a less stringent application of the exclusionary rule if allowed by federal law[.]"[21] The Court noted that the purpose of the proposed amendment was not an "attempt[] to strengthen Michigan search and seizure protection."[22] The Court ultimately concluded:

> There is no indication that in readopting the language of Const 1908, art 2, § 10 in Const 1963, art 1, § 11 the people of this state wished to place restrictions on law enforcement activities greater than those required by the federal constitution. In fact, the contrary intent is expressed.[23]

Indeed, "the common understanding of the people upon reading the proposed constitutional provision could be nothing but the belief that the search and seizure provision of the new

---

451 n 3; 939 NW2d 129 (2019) ("The Michigan Constitution, Const 1963, art 1, § 11, provides coextensive protection to that of its federal counterpart."); *People v Lucynski*, 509 Mich 618, 634 n 6; 983 NW2d 827 (2022) ("Const 1963, art 1, § 11 has historically been interpreted coextensively with the Fourth Amendment, absent compelling reason to impose a different interpretation.") (quotation marks and citation omitted).

[20] *People v Nash*, 418 Mich 196, 209-213; 341 NW2d 439 (1983) (opinion by BRICKLEY, J.).

[21] *Id*. at 212.

[22] *Id*.

[23] *Id*. at 213. In light of this quote, it is difficult to understand how the majority opinion can read *Nash* as primarily holding that the readoption of Article 1, § 11, at the 1961 Constitutional Convention preserved an "evolving body of state law" regarding search and seizure protections unconnected from its federal constitutional counterpart. I reiterate that *Nash* confirmed that Const 1963, art 1, § 11, does not provide greater protection against government search and seizure than the Fourth Amendment of the United States Constitution, absent a compelling reason.

constitution represented no change."[24]  And finally, "[t]he history of Const 1963, art 1, § 11, and its plain import . . . suggest that its further expansion, with the concomitant expansion of the exclusionary rule to enforce it, should occur only when there is a compelling reason to do so."[25]  Our statements in *Nash* make it remarkably clear that Article 1, § 11 of the Michigan Constitution should be interpreted to provide the same protections as the federal Fourth Amendment.

The majority opinion discards the "compelling reason" test on the basis of nothing more than an observation from this Court in *Sitz v Dep't of State Police* that the "compelling reason" language "should not be understood as establishing a conclusive presumption artificially linking state constitutional interpretation to federal law."[26]  I am not suggesting that our state Constitution is conclusively limited by interpretations of our federal Constitution.  Nonetheless, the " 'compelling reason' test is a convenient formulation of the overarching responsibility to find a principled basis in the history of our jurisprudence for the creation of new rights."[27]  Yes, we are to "independently analyze our state Constitution to ensure that our citizens are receiving the measure of the protections that *they* created,"[28] but we already did so in *Nash*, where we concluded that the two provisions afford the same protections.  Any differences in interpretation between the two provisions

---

[24] *Id*.

[25] *Id*. at 214.

[26] *Sitz*, 443 Mich at 758.

[27] *Id*. at 763.

[28] *People v Tanner*, 496 Mich 199, 222 n 15; 853 NW2d 653 (2014).

8

are subject to a heavy jurisprudential burden: any Court so holding must demonstrate that the Michigan residents who ratified our Michigan Constitution intended to create protections greater than those provided in its federal counterpart. On this point, caselaw from this Court that has examined the ratifiers' intent makes clear that Article 1, § 11, is to be interpreted consistently with its federal counterpart.[29]

The majority opinion's assertion that the 2020 amendment to Article 1, § 11, indicates that the provision provides greater protection than its federal counterpart lacks a logical progression. The federal Constitution does not explicitly protect electronic data and electronic communications from unreasonable search and seizure, but decisions from the Supreme Court of the United States make clear that individuals have a reasonable expectation of privacy in some types of electronic data.[30] Nevertheless, any differences in protections of electronic data by no means open the door to broadening the interpretation of other portions of Article 1, § 11. In fact, the addition of the electronic-data language to Article 1, § 11, without changes to any of the other language in the section, should serve as evidence that the meaning of those clauses remains unchanged in light of the amendment. The people had a chance to alter the language of the section, and they chose to add protections for electronic data and nothing more.

---

[29] See note 19 of this opinion.

[30] See *Carpenter v United States*, 585 US 296; 138 S Ct 2206; 201 L Ed 2d 507 (2018) (holding that individuals have a reasonable expectation of privacy in the cell-site location data gathered by wireless carriers from users' cell phones); *Chatrie v United States*, 609 US ___; ___ S Ct ___; ___ L Ed 2d ___ (June 29, 2026) (Docket No. 25-112) (holding that individuals have a reasonable expectation of privacy in the granular cell-phone location history data gathered by technology companies).

9

The Court majority does not provide a sound reason, let alone a compelling one, for why Article 1, § 11, should be interpreted to provide broader protections than the Fourth Amendment to the federal Constitution in this context. As a result, the majority opinion's reasoning still rests on an interpretation of Article 1, § 11, that is, according to rock-solid precedent, coextensive with the federal Fourth Amendment. Any subsequent caselaw from the United States Supreme Court interpreting the federal Fourth Amendment contrary to today's decision will call the holding of the present case into question because the majority has failed to provide a "compelling reason" sufficient to sever the equal relationship between Article 1, § 11, and the federal Fourth Amendment.

## B. THE TRESPASS THEORY DOES NOT APPLY

The majority opinion invokes the trespass approach to determine whether a search occurred. The majority opinion claims that the trespass approach " 'keeps easy cases easy.' "[31] Unfortunately, the trespass approach does not keep this case easy; quite the opposite.

In *Johnson*, this Court reaffirmed the viability of the trespass approach for determining what constitutes a search.[32] We explained that under this approach, "we consider whether there was a physical trespass on a constitutionally protected area and whether there was an attempt to obtain information."[33] In articulating this test, we relied

---

[31] Quoting *Johnson v VanderKooi*, 509 Mich 524, 537; 983 NW2d 779 (2022), in turn quoting *Florida v Jardines*, 569 US 1, 11; 133 S Ct 1409; 185 L Ed 2d 495 (2013) (quotation marks omitted).

[32] *Johnson*, 509 Mich at 537.

[33] *Id*.

10

on *United States v Jones*.[34]  That case considered the constitutionality of law enforcement's warrantless placement of a Global Positioning System (GPS) tracking device on the defendant's vehicle.[35]  In holding that the placement of the device constituted a search within the meaning of the Fourth Amendment, the Supreme Court stated that "[t]he text of the Fourth Amendment reflects its close connection to property,"[36] and noted that "for most of our history the Fourth Amendment was understood to embody a particular concern for government trespass upon the areas ('persons, houses, papers, and effects') it enumerates."[37]  The Court stated that, "[w]here . . . the Government obtains information by physically intruding on a constitutionally protected area, . . . a search has undoubtedly occurred."[38]  We adopted this same principle in *Johnson* when we held that police fingerprinting of a suspect was a trespassory search in violation of the Fourth Amendment of the federal Constitution.[39]

This is all well and true, but inapplicable to the facts of the present case.  The *Jones* Court emphasized that in that case, "[t]he Government physically occupied private property for the purpose of obtaining information."[40]  The Court continued, "We have no

---

[34] *United States v Jones*, 565 US 400; 132 S Ct 945; 181 L Ed 2d 911 (2012).

[35] *Id*. at 402.

[36] *Id*. at 405.

[37] *Id*. at 406.

[38] *Id*. at 406 n 3.

[39] *Johnson*, 509 Mich at 529-530.

[40] *Jones*, 565 US at 404.

doubt that such a *physical intrusion* would have been considered a 'search' within the meaning of the Fourth Amendment when it was adopted."[41]  And again, "for most of our history the Fourth Amendment was understood to embody a particular concern for government *trespass* upon the areas ('persons, houses, papers, and effects') it enumerates."[42]  These statements demonstrate that the touchstone of the trespass theory of government searches requires an *intrusion* or *trespass* on the property of the affected party.

In this case, defendant alleges an unconstitutional search with respect to his pants that were inventoried by the police upon his booking at the station.  We have noted previously that " 'trespass' at common law 'simply meant taking a chattel from one who had possession of it.' "[43]  Importantly, "there is no trespass [where] the [alleged trespasser] initially received possession lawfully . . . ."[44]  In this case, the police committed no interference with defendant's possessory interest in his pants.  As discussed more fully below, the police were lawfully in possession of defendant's pants at the time the search occurred.  There can be no trespass to a defendant's property when the alleged trespasser "initially received possession lawfully."[45]  It would be a significant rewriting of the common-law definition of trespass to chattel to stretch the definition of "trespass" to say that the swabbing of the exterior of defendant's pants constituted a trespass on the pants.

---

[41] *Id*. at 404-405 (emphasis added).

[42] *Id*. at 406 (emphasis added).

[43] *People v March*, 499 Mich 389, 408; 886 NW2d 396 (2016) (citation omitted).

[44] *Id*.

[45] *Id*.

Neither *Jones* nor *Johnson* contradicts this conclusion. In *Jones*, law enforcement interfered with the defendant's possessory interest in his vehicle by attaching a GPS tracking device to the vehicle, which was still in his possession, without receiving his consent. Similarly, in *Johnson*, the trespassory search occurred when the police gathered information from the defendant's person by making contact with his body.[46] Unlike the circumstances in *Jones* or *Johnson*, defendant did not have possession of his pants, and they were not connected to his body at the time of testing. While a trespass can be said to have occurred in *Jones* and *Johnson*, no such trespass occurred in this case.

Accordingly, I would conclude that, under the trespass approach to determining what constitutes a search for purposes of Article 1, § 11, and the Fourth Amendment to the federal Constitution, no search occurred in the present case.

## C. DEFENDANT HAD NO REASONABLE EXPECTATION OF PRIVACY

The other basis for protection under the Fourth Amendment is the concept of a "constitutionally protected reasonable expectation of privacy," first recognized in *Katz v United States*.[47] Accordingly, the next step in the analysis of defendant's claim is to ask whether he had a reasonable expectation of privacy in his pants, which were lawfully in police custody. I conclude that he did not.

---

[46] Which, as we noted in *Johnson*, qualified as a trespass. *Johnson*, 509 Mich at 536 ("[P]hysical intrusions onto an individual's *body* are also covered under the trespass doctrine.").

[47] *Katz v United States*, 389 US 347, 360; 88 S Ct 507; 19 L Ed 2d 576 (1967) (Harlan, J., concurring).

The privacy-based theory of Fourth Amendment protections asks two questions. "First, we ask whether the individual, by his conduct, has exhibited an actual expectation of privacy; that is, whether he has shown that he sought to preserve something as private."[48] And "[s]econd, we inquire whether the individual's expectation of privacy is one that society is prepared to recognize as reasonable."[49] Although there is no "single metric or exhaustive list of considerations to resolve the circumstances in which a person can be said to have a reasonable expectation of privacy,"[50] the Supreme Court of the United States "has explained that legitimate expectations of privacy by law must have a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society."[51]

In determining whether defendant had an expectation of privacy in his pants at the time of the testing, we must consider the circumstances under which the police were in possession of defendant's pants. In this case, the police had custody of defendant's pants as part of an inventory procedure. The Supreme Court of the United States has articulated the justifications for taking and holding the possessions of the arrestee in this manner by noting:

> At the stationhouse, it is entirely proper for police to remove and list or inventory property found on the person or in the possession of an arrested

---

[48] *Bond v United States*, 529 US 334, 338; 120 S Ct 1462; 146 L Ed 2d 365 (2000) (quotation marks, citations, and brackets omitted).

[49] *Id*. (quotation marks, citation, and brackets omitted).

[50] *Byrd v United States*, 584 US 395, 405; 138 S Ct 1518; 200 L Ed 2d 805 (2018) (quotation marks and citations omitted).

[51] *Id*.

14

person who is to be jailed. A range of governmental interests supports an inventory process. It is not unheard of for persons employed in police activities to steal property taken from arrested persons; similarly, arrested persons have been known to make false claims regarding what was taken from their possession at the stationhouse. A standardized procedure for making a list or inventory as soon as reasonable after reaching the stationhouse not only deters false claims but also inhibits theft or careless handling of articles taken from the arrested person. Arrested persons have also been known to injure themselves—or others—with belts, knives, drugs, or other items on their person while being detained. Dangerous instrumentalities—such as razor blades, bombs, or weapons—can be concealed in innocent-looking articles taken from the arrestee's possession. The bare recital of these mundane realities justifies reasonable measures by police to limit these risks—either while the items are in police possession or at the time they are returned to the arrestee upon his release. Examining all the items removed from the arrestee's person or possession and listing or inventorying them is an entirely reasonable administrative procedure. It is immaterial whether the police actually fear any particular package or container; the need to protect against such risks arises independently of a particular officer's subjective concerns. Finally, inspection of an arrestee's personal property may assist the police in ascertaining or verifying his identity.[52]

In this case, defendant's pants were taken from him at the time of his booking, along with the rest of his clothing and personal effects. The parties do not dispute that the police had constitutional authority to do at least this much. Thus, at the time defendant's pants were forensically tested, the police had lawful custody of the pants.

As a result, the question becomes whether, in spite of the fact that police lawfully had custody of the pants and defendant did not, defendant yet retained a reasonable expectation of privacy. Although it appears that no court has addressed a perfectly analogous fact pattern, courts have had much to say about the constitutional rights of detainees, which provides useful context for answering the question in this case. For

---

[52] *Illinois v Lafayette*, 462 US 640, 646; 103 S Ct 2605; 77 L Ed 2d 65 (1983) (citation omitted).

15

example, prison inmates have no reasonable expectation of privacy in their prison cells.[53] Random searches of prison cells—even when not made pursuant to any enunciated policy—do not violate the Fourth Amendment.[54] Prisoners may lawfully be subject to strip searches,[55] even if arrested for minor offenses.[56] Prisoners may be prohibited from having contact visits.[57] Upon booking, police may seize and inventory everything on the person of the arrestee,[58] and such an inventory may occur 10 hours after arrest.[59] Many state laws allow for impoundment of the vehicle an arrestee was driving at the time of arrest, and courts have held that police may, pursuant to official policy, conduct a routine inventory search of an impounded vehicle,[60] and may, pursuant to official policy, open any closed containers they discover in that process.[61] Upon arrest, police may take a DNA sample from an arrestee, create a DNA profile from the sample, and then upload that profile to a

---

[53] *Hudson v Palmer*, 468 US 517, 526-530; 104 S Ct 3194; 82 L Ed 2d 393 (1984).

[54] *Id*.

[55] *Bell v Wolfish*, 441 US 520, 558; 99 S Ct 1861; 60 L Ed 2d 447 (1979).

[56] *Florence v Bd of Chosen Freeholders of Co of Burlington*, 566 US 318, 330, 338-339; 132 S Ct 1510; 182 L Ed 2d 566 (2012).

[57] *Block v Rutherford*, 468 US 576, 588; 104 S Ct 3227; 82 L Ed 2d 438 (1984).

[58] *Lafayette*, 462 US at 646, 648.

[59] *United States v Edwards*, 415 US 800, 801, 804-805; 94 S Ct 1234; 39 L Ed 2d 771 (1974).

[60] *South Dakota v Opperman*, 428 US 364, 369-371; 96 S Ct 3092; 49 L Ed 2d 1000 (1976).

[61] *Colorado v Bertine*, 479 US 367; 107 S Ct 738; 93 L Ed 2d 739 (1987).

database where it can be matched to other cases.[62] In short, "[a] detainee simply does not possess the full range of freedoms of an unincarcerated individual."[63]

In light of all of these cases narrowing the rights of arrestees and prisoners, it is difficult to conclude that defendant in the present case retained a reasonable expectation of privacy in his pants, especially after they were lawfully taken as part of a routine inventory procedure.[64] And if that is not enough, *United States v Edwards*,[65] which the majority

---

[62] *Maryland v King*, 569 US 435; 133 S Ct 1958; 186 L Ed 2d 1 (2013).

[63] *Bell*, 441 US at 546.

[64] The majority opinion responds that the listed cases involve administrative or safety-related searches, while in this case, the police conducted an investigative search. Absent a case suggesting that the police in the present case were exempt from the warrant requirement under one of these recognized justifications, the majority opinion concludes that police may not "subject a lawfully seized object to additional scrutiny unrelated to institutional safety." Instead, the majority asserts that an individual maintains a privacy interest in objects lawfully in the possession of police. First, by engaging in this debate, the majority opinion contradicts its earlier proclamation that the trespass approach is sufficient to analyze this case. Second, while it is true that our caselaw has suggested that individuals may maintain some expectation of privacy in objects lawfully seized, "one's reasonable expectation of privacy is diminished . . . when an officer *lawfully* seizes an object from an individual." *Custer*, 465 Mich at 343 (opinion by MARKMAN, J.). Moreover, the cases listed above demonstrate that, in this instance, defendant retained no expectation of privacy in his pants. Therefore, the police did not "search" defendant's pants within the meaning of the Constitution. Accordingly, the police did not need an exception to justify the forensic testing of defendant's pants.

The majority opinion also understands my dissent to be arguing that the forensic testing was permissible under the inventory and search-incident-to-arrest exceptions. I nowhere argue that either the inventory or search-incident-to-arrest exception applies to this case. Rather, I cite many cases highlighting the diminished privacy expectations of prisoners and argue from there that defendant had no reasonable expectation of privacy in his pants at the time of the forensic testing—i.e., there was no need to inquire whether a warrant exception applied.

[65] *Edwards*, 415 US 800.

opinion relies on extensively for its holding, repeatedly reinforces the conclusion that defendant had no privacy interest in his pants at the time they were tested:

> Nor is there any doubt that clothing or other belongings may be seized upon arrival of the accused at the place of detention and later subjected to laboratory analysis or that the test results are admissible at trial.[66]

> \*   \*   \*

> . . . Indeed, it is difficult to perceive what is unreasonable about the police's examining and holding as evidence those personal effects of the accused that they already have in their lawful custody as the result of a lawful arrest.[67]

> \*   \*   \*

> . . . While the legal arrest of a person should not destroy the privacy of his premises, it does—for at least a reasonable time and to a reasonable extent—take his own privacy out of the realm of protection from police interest in weapons, means of escape, and evidence.[68]

These quotations from *Edwards* indicate that an arrestee retains only a minimal privacy interest in his personal effects upon booking at the stationhouse.

The majority opinion's reliance on *Edwards* to support its holding is misguided. In particular, the Court majority relies heavily on *Edwards*'s discussion of the applicable exceptions to the warrant requirement. But in *Edwards*, the dispute focused on the delay between the defendant's arrest and the subsequent seizure and search of his clothing. The Court concluded that both the search-incident-to-arrest exception and the inventory-search exception applied, even after such a delay. Here, there is no dispute that the search-

---

[66] *Id*. at 803-804.

[67] *Id*. at 806.

[68] *Id*. at 808-809 (quotation marks and citation omitted).

incident-to-arrest exception and the inventory-search exception apply: police could constitutionally search defendant upon arrest and constitutionally seize and inventory his clothing and personal effects at the time of booking. Instead, the question is whether a search occurred at all in light of the fact that the inventory exception *already applied* to grant police lawful custody of defendant's pants. The many limitations on the rights of prisoners and arrestees indicate that defendant carried no reasonable expectation of privacy with respect to his pants, and that therefore, no search occurred within the meaning of Article 1, § 11, or the Fourth Amendment of the federal Constitution. *Edwards* accords with this result.

In sum, the significant curtailment of the rights of arrestees and prisoners outweighs the sparse retention of rights by those individuals. On the whole, caselaw supports the holding that normal expectations of privacy in personal effects—including clothing—are substantially reduced in the context of stationhouse detention. Given that the pants were lawfully in police custody as part of a routine inventory procedure, I cannot conclude either that the police "trespassed" on defendant's pants or that defendant had a reasonable expectation of privacy in his pants.

Our holdings in *People v Trudeau*[69] and *People v Carr*[70] do not, as the majority suggests, contradict this result. In *Carr*, we considered whether police violated the defendant's rights by searching his vehicle, which was in the police station parking lot, for

---

[69] *People v Trudeau*, 385 Mich 276; 187 NW2d 890 (1971).

[70] *People v Carr*, 370 Mich 251; 121 NW2d 449 (1963).

19

evidence of a crime separate from the one for which he was arrested.[71] We concluded that the police had no constitutional basis for conducting the search.[72] Similarly, in *Trudeau*, we considered whether the police violated the defendant's rights when they seized his shoes between court sessions in order to test them for connection to a crime unrelated to the one for which the defendant was then under arrest.[73] We again concluded that the police had no Fourth Amendment justification for the search.[74] These cases, however, are distinguishable. In *Carr*, the defendant retained both his property-based rights and a reasonable expectation of privacy in the inviolability of his vehicle.[75] In contrast, once defendant's pants were lawfully removed from his possession and custody here, he no longer retained any privacy interest in his pants. Similarly, in *Trudeau*, the defendant still had possession of his shoes, and they were removed by police only for the purpose of investigation and without probable cause. As the Court of Appeals pointed out in this case, "The defendant in *Trudeau* obviously had a reasonable or justifiable expectation of privacy in the shoes on his feet."[76] In contrast, here, the police had lawful custody of defendant's pants at the time of the forensic analysis. The Court of Appeals noted this as well: "This

---

[71] *Id*. at 253-254.

[72] *Id*. at 255-256.

[73] *Trudeau*, 385 Mich at 278.

[74] *Id*. at 281.

[75] The majority opinion responds that defendant had an expectation that his pants would be returned to him upon his release, just as the *Carr* defendant expected to get his vehicle back. I agree. However, once the police learned that the pants were evidence of a crime, they had probable cause to retain custody of the pants had defendant been released.

[76] *Serges*, 351 Mich App at 118.

20

case differs from *Trudeau* in that defendant's pants and other clothing and belongings were not in his possession."[77]  Accordingly, the forensic testing violated none of defendant's existing property or privacy interests with respect to his pants.

### D.  COUNSEL'S FAILURE TO MOVE TO EXCLUDE THE EVIDENCE DID NOT RENDER HIM INEFFECTIVE

To establish a claim of ineffective assistance of counsel, a defendant must show both that counsel's performance was deficient and that counsel's deficient performance prejudiced the defense.[78]  Specifically, "a defendant must show that (1) counsel's performance fell below an objective standard of reasonableness and (2) but for counsel's deficient performance, there is a reasonable probability that the outcome would have been different."[79]  With regard to the objective standard of reasonableness, "a defendant must overcome the strong presumption that counsel's performance was born from a sound trial strategy."[80]  However, courts must not be too deferential; "a court cannot insulate the review of counsel's performance by calling it trial strategy."[81]

Because defendant lacked a reasonable expectation of privacy in his pants at the time of the forensic testing, the test results were properly admitted at trial.  As a result, defendant's trial counsel was not ineffective for failing to make a futile claim.  Because

---

[77] *Id.*

[78] *People v Hoag*, 460 Mich 1, 5; 594 NW2d 57 (1999), citing *Strickland v Washington*, 466 US 668, 687; 104 S Ct 2052; 80 L Ed 2d 674 (1984).

[79] *People v Trakhtenberg*, 493 Mich 38, 51; 826 NW2d 136 (2012).

[80] *Id.* at 52.

[81] *Id.*

21

any objection or motion to exclude would have properly been denied on constitutional grounds, defendant was not prejudiced by trial counsel's failure to raise the issue.

## III. CONCLUSION

Apparently, the United States Supreme Court has never considered a case with a fact pattern analogous to this one. But the Supreme Court has said much on related subjects, and that caselaw supports the conclusion that defendant did not have a reasonable expectation of privacy in his pants when they were lawfully in police custody pursuant to routine inventory procedures. As a result, police did not conduct a "search" within the meaning of the Fourth Amendment when they forensically tested defendant's pants. I would hold that no search occurred here, and that accordingly, the evidence was properly admitted. I disagree with the majority opinion's application of the trespass theory of the Fourth Amendment to the facts of this case, as it misconstrues the concept of trespass by holding that the police "trespassed" on an article of clothing that was already lawfully in their possession. Finally, considering defendant's failure to demonstrate constitutional error, his claim of ineffective assistance of counsel must also fail.

I dissent.

Brian K. Zahra


HOOD, J., did not participate because he was on the Court of Appeals panel that issued the decision under review.

22